Dennis G. MOORE, George R. Moore and Sierra Products, Inc., Plaintiffs-Appellants, Cross-Appellees,

v.

WESBAR CORPORATION and Bernard R. Weber, Defendants-Appellees, Cross-Appellants.

Nos. 82–1917, 82–1969.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1982.

Decided March 10, 1983.

August E. Roehrig, Jr., Fitzgibbon, Roehrig, Greenawalt & Stone, Chicago, Ill., for plaintiffs-appellants, cross-appellees.

Glenn O. Starke, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., for defendants-appellees, cross-appellants.

Before CUDAHY and COFFEY, Circuit Judges, and TIMBERS,* Senior Circuit Judge.

CUDAHY, Circuit Judge.

Plaintiffs, Dennis G. Moore, George R. Moore and Sierra Products, Inc. ("Sierra"), filed suit against the defendants, Wesbar Corporation ("Wesbar") and Bernard R. Weber, charging that they had infringed a patent owned by the Moores. This patent, U.S. Letters Patent No. 3,106,349, issued originally to Claude F. Bloodgood, Jr. (the "Bloodgood patent"), is for a submersible lighting fixture used on boat trailers. After the jury returned special verdicts finding infringement, the court below determined that the patent in question was invalid as a matter of law for obviousness and therefore that the defendants were not guilty of willful infringement.[1] Plaintiffs have appealed this order to us. Defendants have cross-appealed the jury finding of infringement. We affirm the district court judgment of invalidity and reverse the finding of infringement.

## I.

In the early 1970s, plaintiff Dennis G. Moore developed a submersible boat trailer light which he began to manufacture and sell in partnership with his father, George R. Moore, under the name "Dry Launch." Upon filing an application for letters patent on the device, however, Mr. Moore discovered that certain claims of his application were covered by a prior patent, the Bloodgood patent. Issued in 1963, the Bloodgood patent discloses a submersible tail light for use on a boat trailer. The light fixture consists of a hood-shaped, impervious housing with a bulb and socket positioned in the upper end. The lower end of the housing is open. When the trailer is backed into the water in order to launch the boat, water rises within the lower end of the housing and compresses the air trapped in the impervious upper end. This air pressure prevents water from coming into contact with the bulb and socket, thus preventing popping of the hot bulb upon contact with the water. When the boat trailer is pulled out of the water, the water drains out from the open lower end, preventing corrosion of the components. Drawings of the Bloodgood model appear in Appendix A of this opinion.

The original application for the Bloodgood patent stated its objectives as follows:

(1) a lamp fixture which when immersed in water will trap air inside which prevents the water from coming into contact with the lamp bulb and bulb socket;

(2) a lamp fixture with an open lower end to facilitate drainage of the limited amount of water that enters the housing when the lamp fixture is submerged under water;

(3) a lamp fixture with an unobstructed open lower end through which light rays may pass to illuminate a license plate positioned below.

Mr. Moore's patent application was rejected on the basis of the Bloodgood patent, although he did obtain a patent on the device by which the bulb and bulb socket of his lamp were mounted within the housing. He proceeded to locate the owner of the Bloodgood patent, the Bloodgood estate, and to purchase the Bloodgood patent on November 2, 1973 for $2,500. The patent was later assigned to the Dry Launch Light Company, the Moores' partnership, and subsequently to Sierra Products, Inc., successor in interest to the Dry Launch Light Company and one of the plaintiffs in this law suit. Sierra manufactures and sells a boat trailer light incorporating both the Bloodgood patent and Moore's mounting under the name "Dry Launch." Plaintiffs have submitted into evidence letters from customers indi-

---

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

1. Plaintiffs also sued for product disparagement, but the judgment below on that issue is not being appealed.

cating that they were satisfied with the light's solution to the problems of corrosion and bulb-popping.

Defendant Wesbar is a company which manufactures and sells various components for boat trailers; defendant Bernard Weber was its chief executive officer until January 1, 1980. When the Dry Launch light came on the market, Wesbar apparently made plans to manufacture a competing submersible boat trailer light. In early 1976 Wesbar instructed its patent attorney, James Nilles, to evaluate the Bloodgood patent and render an opinion containing guidelines for a design which would not infringe that patent. On May 17, 1976 Mr. Nilles, basing his opinion on the Bloodgood patent, the file wrapper[2] and the patent references, advised Wesbar that the patent would not be infringed by a lamp with a closed bottom and suggested that holes for the entry and drainage of water could be placed in the bottom of the side walls instead. Wesbar constructed a prototype of such a light, Plaintiffs' Exhibit 61 ("PX-61"), and began to advertise its new submersible light in September of 1976. This light, PX-61, drawings of which appear in Appendix B, infra, has an impervious upper housing which entraps air; a bulb and socket are mounted in the upper end of the housing. The lower end is enclosed by a clear plastic plate, but small openings are provided at each end of the bottom to permit water to drain from the housing. In June of 1977, Mr. Weber presented this light to Mr. Nilles, Wesbar's counsel, who gave his opinion that the light did not infringe the claims of the Bloodgood patent. Wesbar proceeded to produce and market this submersible trailer light.

On September 28, 1978, the plaintiffs filed a complaint charging infringement of the Bloodgood patent, as well as trade disparagement. After the suit was filed, Wesbar altered its initial model, PX-61, so as completely to enclose the lower end of the housing, eliminating the openings in the bottom plate. This second model, Plaintiffs' Exhibit 63 ("PX-63"), a drawing of which appears as Appendix C, infra, contains a central drainage hole in the bottom plate (made of clear plastic), which is closed by a screw which can be removed to drain water from the device. The plaintiffs charge that both models infringe the Bloodgood patent.

The issue of infringement was tried to a jury on April 7-14, 1981. After the jury returned special verdicts finding that both PX-61 and PX-63 infringed the claims of the Bloodgood patent, the judge determined that the patent was nonetheless invalid as a matter of law for obviousness and for this reason that the defendants were not guilty of infringement.[3] In his opinion, the district court judge undertook the factual inquiries required by *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), in determining obviousness or non-obviousness of a patent. *Moore v. Wesbar Corp.*, No. 78-C-624 (E.D.Wis. Sept. 1, 1981). The judge determined, first, that the scope and content of the prior art included the references cited by the United States Patent Examiner as well as the references cited by the defendants at trial. The judge found, second, that the Bloodgood patent differed substantially from the prior art before the Patent Examiner, but did not differ significantly from several references cited by the defendant. Third, the judge found that the level of ordinary skill in the pertinent art was that of a person having some mechanical ability and some knowledge of physics and fluid flow. In finding the Bloodgood patent to be invalid as obvious, the court held that the statutory presumption of the validity of a patent had been overcome, since the most pertinent prior art, represented by the references submitted by the defendant, had not been be-

---

**2.** The file wrapper contains the correspondence between the inventor and the Patent Office.

**3.** The jury also returned a verdict finding product disparagement, but found that the plaintiffs had suffered no special damages. The court then entered a judgment notwithstanding the jury verdict, holding that special damages were an essential element of a product disparagement claim. These issues are not before us on appeal.

fore the Patent Examiner. In addressing the plaintiffs' claims that the commercial success of their light indicated that it was not obvious, the court held following our decision in *Republic Industries v. Schlage Lock Co.*, 592 F.2d 963 (7th Cir.1979), that secondary considerations such as commercial success cannot, alone, render a patent valid.

Also the district court, on a motion to set aside the jury verdict on the issue of infringement as unsupported by sufficient evidence, denied the motion. The defendants have cross-appealed from this determination.

■ An initial question confronting us in this case is that of the scope of our review of the district court's findings on obviousness. The defendants here assert that our task is limited to assessing whether Judge Reynolds followed the legal standard prescribed in *Graham v. John Deere*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and maintain that findings based on that standard may not be overturned unless they are clearly erroneous. Plaintiffs, on the other hand, insist that validity of a patent, including the question of obviousness, is a question of law, which this court may decide *de novo.* A clarification of this issue is clearly a prerequisite to our addressing the issue of obviousness. The ultimate legal question which this court must answer, of course, is that posed by the statute: "[whether] the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (1976). On this question—nonobviousness as a condition for the validity of a patent—this court is entitled—in fact, obliged—to make an independent judgment. *E–T Industries v. Whittaker Corp.*, 523 F.2d 636 (7th Cir.1975), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *see also Dual Manufacturing & Engineering, Inc. v. Burris Industries,* 619 F.2d 660, 663 (7th Cir.) (en banc), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).

■■ Nonetheless, in the *Graham* case, the Supreme Court has directed that a district court considering the *legal* question of obviousness must undertake a preliminary, three-part *factual* inquiry into the scope and content of the prior art, the differences between the prior art and the claim at issue and the level of ordinary skill in the pertinent art. 383 U.S. at 17, 86 S.Ct. at 693. This tripartite inquiry is intended to establish a background of fact against which the ultimate statutory question may be answered; and the findings made by the district court pursuant to this inquiry are findings of fact, which may not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). An exception is sometimes made in cases where the evidence on these findings is wholly documentary or involves the actual examination of a product or device in operation, *Deep Welding, Inc. v. Sciaky Bros.,* 417 F.2d 1227, 1229 (7th Cir.1969), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648 (1970). But, where the district court's findings instead rest, as here, upon a combination of documentary and testimonial evidence, we must accept those findings, unless they are clearly erroneous. *LaSalle Street Press v. McCormick & Henderson, Inc.,* 445 F.2d 84, 87 (7th Cir.1971). In this case, Judge Reynolds listened to five days of testimony before making the findings of fact required by the *Graham* case; and we would not presume to overturn those findings unless it were clear to us that they were in error. Instead, we think the judge's findings were well-supported. Accepting those findings, however, we must nonetheless independently review his conclusion that the Bloodgood patent was obvious and thus invalid.

## III.

The district court made carefully detailed findings of fact in relation to each prong of the *Graham* test; we reproduce and adopt those findings here:

The first *Graham* inquiry is to determine the scope and content of the prior art. The scope and content of the prior

art includes the file wrapper references cited by the United States Patent Office Examiner as well as the references cited by the defendants at trial. Cited as references by the Examiner were: *Lindsey,* U.S. Patent No. 1,129,695, disclosing an automobile tail light; *Overtree,* U.S. Patent No. 1,356,494, disclosing an automobile tail and license number light; *Newhardt,* U.S. Patent No. 2,391,475, disclosing a [duck] decoy; *Finney,* U.S. Patent No. 2,702,862, disclosing a housing for a radiation-generating lamp; *Clayton,* U.S. Patent No.· 2,866,082, disclosing a vehicle lamp; *Keihaefer,* U.S. Patent No. 2,887,-563, disclosing a trailer tail light; and *Beach,* U.S. Patent No. 2,925,487, disclosing an automobile tail light. Cited as references by the defendants at trial were: *Graham,* U.S. Patent No. 1,584,369, disclosing a headlight; *Sutton,* U.S. Patent No. 2,756,301, disclosing a liquid level switch; *Martin,* U.S. Patent No. 2,814,-720, disclosing a vehicle lamp; *Shinn,* U.S. Patent No. 3,046,388, disclosing a waterproof tail light; a German patent ("Germany"), Publication No. 1,099,872, disclosing a vehicle lamp; an excerpt from Knight's Mechanical Dictionary disclosing a history of underwater diving bells; and an article by Howard E. Larson entitled "A History of Self Contained Diving and Underwater Swimming," disclosing a history of underwater diving bells.

．　　．　　．　　．　　．

The second *Graham* inquiry is to determine the differences between the prior art and the claims. The differences between the more relevant prior art and the claims of the Bloodgood Patent are as follows. The Bloodgood Patent differs from the *Lindsey* patent and the *Overtree* patent in that the Bloodgood Patent claims call for an impervious housing and a sealed lens. Moreover, neither the *Lindsey* patent nor the *Overtree* patent make [sic] any suggestion that the patented device could be submerged in water. The difference between the *Beach* patent and the Bloodgood Patent claims is that the claims call for an open

lower end and an impervious housing while the *Beach* patent shows neither an open lower end nor an impervious housing. Moreover, the *Beach* patent does not suggest that the patented device could be submerged in water. . . .

. . . The Court finds that the Bloodgood Patent differs from the *Newhardt* patent in that the latter does not suggest that the patented device could be submerged in water. The Bloodgood Patent differs from the *Germany* publication in that the Bloodgood Patent claims call for a housing that is both air and water tight. Moreover, the *Germany* publication does not suggest that the patented device could be submerged in water. The difference between the *Shinn* patent and the Bloodgood Patent claims is that the claims call for an open lower end while the *Shinn* patent shows a completely sealed housing. The difference between the two diving bell articles and the Bloodgood Patent claims is that the latter relates the application of the general gas law or air entrapment principle to a boat trailer light while the two diving bell articles relate the application of this law or principle to diving bells that house men and illuminating devices. This difference is not significant.

．　　．　　．　　．　　．

The third *Graham* inquiry is to determine the level of ordinary skill in the pertinent art. Based on the uncontroverted testimony of the defendants' expert, Dr. Slater, the Court finds that the level of skill in the pertinent art is that of a person having some mechanical ability and some knowledge of physics and fluid flow.

*Moore v. Wesbar Corp.,* No. 78–C–624, slip op. at 3–5 (E.D.Wis. Sept. 1, 1981).

Since none of these findings by the district court is clearly erroneous, we accept them as the factual basis for our further inquiry into the validity of the Bloodgood patent.

## IV.

■ Having accepted the trial court's findings of fact as to the prior art, differences between the prior art and the claims at suit, and the relevant level of skill, this court must now address the statutory question of validity under 35 U.S.C. § 103. Although we would ordinarily undertake this inquiry against a statutory presumption of patent validity, 35 U.S.C. § 282 (1976), this presumption is destroyed if the pertinent prior art was not before the Patent Examiner when the patent issued. *See, e.g., Republic Industries v. Schlage Lock Co.,* 592 F.2d 963, 972 (7th Cir.1979); *Shemitz v. Deere & Co.,* 623 F.2d 1180, 1184 (7th Cir.) (per curiam), *cert. denied,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980).

In the case before us, the defendants have cited several descriptions in printed publications which were not before the Patent Examiner at the time the Bloodgood Patent was issued. In particular, they have cited various articles on the history of diving, which both describe and depict diving bells operating on the air-trapping principle utilized in the Bloodgood patent. These articles demonstrate that the air-trapping principle has long been recognized as a method of preventing water from entering the upper end of a submerged impervious housing. Some of the diving bells described, moreover, contain not only windows but also lamps on the interior.

The prior art references cited by the Patent Examiner, on the other hand, do not include any illustrations of the operation of the air-trapping principle. None of the lights or lamps cited was designed to be submerged in water. The plaintiffs contend that the *Newhardt* patent, disclosing a floating rubber duck decoy, is an example of prior art which is as pertinent as that revealed by the diving bells. However, although it is true that the central cavity of the *Newhardt* decoy does entrap air, it also contains water. The purpose of the central cavity is, by sucking up water, to increase the stability of the duck on the surface of the water; there is no suggestion that the duck can be submerged, nor is there any

indication that a lens or light could be incorporated into the device. We therefore affirm the district court's holding that the statutory presumption of validity attached to the Bloodgood patent is destroyed by the fact that the Patent Examiner did not have the most pertinent prior art before him.

The question which remains for our decision may be stated as follows: would the differences between the claims of the Bloodgood patent and the prior art and publications identified by the district court have been obvious at the time the Bloodgood patent was issued to a person having some mechanical ability and some knowledge of physics and fluid flow? After reviewing the record in this case, we believe the claims would indeed have been obvious and thus that the Bloodgood patent is invalid. We reach this conclusion for two reasons. First and most important is our own consideration of the articles on diving bells. Not only is it apparent that the airtrapping principle has been recognized since the days of Aristotle, but it is also clear that it has been embodied in devices which are very similar to the application of the principle in the Bloodgood patent. Central to the operation of the patent at suit is the combination of an impervious upper casing with an open lower end, thus protecting a lighting fixture from water by compressing air in the upper end of the device. The diving bell articles illustrate precisely this combination, as well as a window similar to the lens incorporated in the boat trailer lights here.

Our conclusion that this particular application of the air-trapping principle would be obvious to a person of mechanical ability familiar with basic physics and fluid flow is supported by the testimony of defendants' witnesses at trial, and in particular by the testimony of Dr. John G. Slater, to the effect that the Bloodgood patent would be obvious to a person of the prescribed level of skill. The plaintiffs, however, attack the trial court's reliance upon Dr. Slater's testimony. First, plaintiffs contend that it was improper for the court to have relied upon expert testimony as to the ultimate issue,

obviousness. Yet the Federal Rules of Evidence clearly permit an expert witness to give an opinion on the ultimate question at issue in a case. Fed.R.Evid. 704. Plaintiffs' objection, therefore, must be interpreted as going more to the weight accorded Dr. Slater's testimony, than to its admissibility. On this score, the contention seems to be that Dr. Slater is *over*qualified, since he is an expert in fluid mechanics, rather than a person of ordinary skill, and thus what would be obvious to him might not be obvious to a person endowed with the ordinary skill required by the statute.

■ This objection seems to us to confuse the qualifications of a witness testifying about this question with the level of skill prescribed by the statute. Dr. Slater has a Ph.D. in fluid mechanics and is presently employed as a professor of engineering; he has, in addition, extensive experience as a consultant on applied uses of fluid mechanics. Although he is a person of more than the "ordinary skill" required by the statute, he is in many ways well suited to assist the court in deciding what would be obvious to such a person. As this court recognized in *Wahl v. Carrier Manufacturing Co.,* 452 F.2d 96, 105 (7th Cir.1971), *cert. denied,* 405 U.S. 990, 92 S.Ct. 1255, 31 L.Ed.2d 457 (1972), an engineering professor, in contact with students at different levels of developing skill, is particularly qualified to assess what would be obvious to persons of lesser skill than his own. It is hardly necessary to interview or to survey those students individually. Dr. Slater's qualifications as a witness on the question of obviousness were, in our opinion, excellent, and the trial court quite properly gave credence to his testimony on this issue. Again viewing the question of obviousness as a matter of law in light of all the evidence, we approve the conclusion of the district court that the Bloodgood patent is invalid as a matter of law for obviousness.

### V.

■ Plaintiffs have not attempted to counter Dr. Slater's testimony with testimony by another expert that the Bloodgood patent would *not* have been obvious; instead they point to the commercial success of the Dry Launch lamp. Because the Bloodgood patent which their lamp incorporates, and to which they attribute its success, filled a long-felt need, they argue that it could not have been obvious. The reasoning underlying such an argument, presumably, is that no obvious device will yield a good profit for its maker because the same idea will occur to others; conversely, a nonobvious device will either not be invented or will prove to be an unusual commercial success. The defendants respond that the Bloodgood patent was never even developed and marketed as such and that the success of the Dry Launch lamp must therefore be attributed to the Moores' improvements on it.

We do not think it necessary to decide whether the success of the Dry Launch light is attributable to the Bloodgood patent or to improvements on it. Although the Supreme Court did indicate in the *Graham* case that such factors as commercial success may be relevant on the question of obviousness, 383 U.S. at 17–18, 86 S.Ct. at 693–94, this circuit has repeatedly taken the position that secondary factors alone may not form the basis of a finding of validity. *See, e.g., Republic Industries v. Schlage Lock Co.,* 592 F.2d at 975; *Dual Manufacturing & Engineering, Inc. v. Burris Industries,* 619 F.2d at 666; *Centsable Products v. Lemelson,* 591 F.2d 400, 403 (7th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979). Since we have held that the claims of the Bloodgood patent were obvious, commercial success, as a secondary factor, does not suffice to establish the validity of the patent in question.

### VI.

■ The defendants here also contend that the jury verdicts of infringement are not supported by sufficient evidence and should be reversed. Although our disposition of the obviousness issue makes such a determination unnecessary, we believe that the jury verdict was not supported by sufficient evidence. A patent is a monopoly, the limits of which are narrowly and strictly

confined to the terms of the grant. *Mercoid Corp. v. Mid-Continent Co.,* 320 U.S. 661, 665, 64 S.Ct. 268, 271, 88 L.Ed. 376 (1943). The claim which is the measure of that grant is required to be very specific in order to protect the public against extension of the monopoly beyond its scope. *Universal Oil Products Co. v. Globe Oil & Refining Co.,* 322 U.S. 471, 484–85, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399 (1944). A determination of infringement, therefore, requires a comparison of the accused device with the language used by the inventor to describe the limits of his invention.

In this case, claims 1 and 2 of the Bloodgood patent read in part as follows:

1. A lamp structure for a boat hauling trailer consisting of,

    an impervious hood shaped housing having spaced walls,

    \*    \*    \*    \*    \*    \*

    lower portions of said walls having substantially vertical inner surfaces and *providing an open lower end for the housing,*

    said housing and said lens being impervious *above said open lower end through which water may enter when the housing is immersed in water* whereby air trapped within the housing develops pressure restricting the water to the lower portion of the housing, and said inner surfaces of the walls facilitating drainage of water from the housing.

2. A lamp structure for a boat hauling trailer consisting of,

    an impervious hood shaped housing having spaced walls,

    \*    \*    \*    \*    \*    \*

    said housing *having an open lower end throughout the area between said walls,*

    lower portions of said walls having substantially straight upright inner surfaces *continuing to said open lower end,*

    and said housing and lens being impervious *above said open lower end* through which water in a limited quan-

tity may enter when the housing is immersed in water. (Emphasis supplied.)

Most pertinent to the difference between the Wesbar lights accused of infringement and the Bloodgood patent is the statement in both claims that the structure includes an "open lower end"; claim 2 specifies, moreover, that the housing has "an open lower end throughout the area between said walls." The Bloodgood patent drawings also show a structure with a completely open lower end. In addition, the text of the Bloodgood patent, U.S. No. 3,106,349, repeatedly emphasizes that the lower end is open and unobstructed in order to facilitate drainage and to allow air to circulate freely within the housing. *See, e.g.,* Column 1, lines 42–45; Column 2, lines 65–72. Defendants also refer us to several passages in the correspondence between Mr. Bloodgood and the Patent Office in which the inventor emphasized that his device was open and unobstructed across the lower end and explained how important this feature was to the drainage of water and circulation of air.

Neither of the Wesbar lamps accused of infringement has an unobstructed lower end. Although PX–61 does have holes or slots at each end of the bottom which allow water to enter and thus bring the air-trapping principle into operation, the bottom of this Wesbar model could not by any stretch of the imagination be described as "open and unobstructed." It is covered by a clear plastic plate. Its appearance suggests that it was specifically designed so as not to fall within the claims of the Bloodgood patent. Indeed, the testimony of the defendants' witness and attorney, Mr. Nilles, indicates that this was the precise reason why the Wesbar light was designed in that manner; in fact, he testified that the design of PX–61 was a response to his own advice about the scope of the Bloodgood patent. PX–63, moreover, has *no* opening along the bottom, which is entirely covered with a closed plastic plate.

Both of the defendants' witnesses on the issue of infringement—Mr. Nilles and Mr. Klitzke—pointed out this characteristic of

the Wesbar lamps, concluding that the models did not therefore infringe the claims of the Bloodgood patent. Plaintiffs' witness, Mr. Lucas, on the other hand, asserted that the Bloodgood claim should be read so as to interpret the word "open" as meaning "open to light," or translucent. This assertion seems incredible, in light of Mr. Bloodgood's repeated statements that his device was designed with an open bottom in order to allow both for entry and drainage of water and for free circulation of air within the housing as well as for the transmission of light onto the license plate. We therefore think that the jury verdict in this case was not supported by sufficient evidence and that the defendant could not be found guilty of infringement even if the patent in suit were valid.[4]

The determination of the district court that claims 1 and 2 of the Bloodgood patent, U.S. No. 3,106,349, are invalid is approved and the judgment is affirmed.

---

4. As Judge Reynolds correctly points out, moreover, even if the court had upheld the finding of infringement in this case, the fact that the defendants requested an opinion from their patent attorney and did not manufacture and sell the Wesbar lamps accused of infringement until after receiving that attorney's opinion that they did not infringe the Bloodgood patent negates an inference of willful infringement. *Deere & Co. v. International Harvester Co.*, 658 F.2d 1137, 1147 (7th Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 514, 70 L.Ed.2d 386 (1981).

# APPENDIX A

Oct. 8, 1963      C. F. BLOODGOOD, JR      3,106,349

LAMP FIXTURE

Filed April 11, 1961

FIG. I

FIG. 2

FIG. 3

INVENTOR

CLAUDE F. BLOODGOOD, JR.

BY

ATTORNEY

## APPENDIX B

### WESBAR LIGHT
### PX. 61

A: clear plastic plate
B: openings

APPENDIX C

WESBAR LIGHT
PX. 63

C: clear plastic plate

D: threaded drainage hole closed by screw